Launa McNaghten and Stuart E. Kelley, Appellees, v. Northwestern Mutual Life Insurance Company, Appellant.

Gen. No. 9,357.

Opinion filed February 24, 1943. Opinion modified and rehearing denied May 4, 1943.

Scott, MacLeish & Falk, of Chicago, and Wirt Herrick, of Clinton, for appellant; Wendell J. Brown, of Chicago, of counsel.

Frank K. Lemon and Grover W. Watson, both of Clinton, for appellees.

Mr. Presiding Justice Riess delivered the opinion of the court.

Northwestern Mutual Life Insurance Company, a corporation, defendant herein, has appealed from a judgment of the circuit court of DeWitt county which was entered on March 3, 1942, in the sum of $2,000 and accrued interest and costs, in a suit at law upon a life insurance policy issued by said company. The judgment was recovered by the plaintiffs appellees, Launa McNaghten as the beneficiary, and Stuart E. Kelley as assignee of a half interest in the policy contract which had been duly issued by the defendant company on September 15, 1923, to Ralph Waldo McNaghten, the husband of said beneficiary. The suit was filed more than seven years after the disappearance of the assured on December 11, 1926, and was based upon the actual or presumptive death of the assured. Motions for a directed verdict and for new trial were interposed by the defendant and denied by the court, and after judgment, defendant perfected its appeal to this court.

The verified complaint, as amended, set forth that the policy sued on was so issued at an annual premium rate of $70.18, which was regularly paid in advance by the assured to the date of September 15, 1927; that on December 11, 1926, the assured disappeared from his home and family at Farmer City, Illinois; that he wrote a postal card from Chicago to his youngest son on that date, but was never thereafter seen nor heard from by any member of the family, friends, acquaintances or other persons, so far as plaintiffs knew or were able to ascertain after diligent inquiry and effort to locate him; that the annual premium due and pay-

able in advance on September 15, 1927, was not paid when due nor within the 30 days grace period thereafter; that under the terms of paragraph 12 of said policy, the insurance had become automatically converted into nonparticipating term insurance for its face amount for the extended period from September 15, 1927, to January 10, 1934; that at the expiration of seven years and within the term of said extended insurance, the assured in fact died or became presumptively dead; that a half interest in the policy was duly assigned to coplaintiff Stuart E. Kelley on January 14, 1938; that due proof of death of the assured was made and all conditions precedent were performed by assured and plaintiffs and after refusal of defendant company to pay the policy claim, suit was filed for the recovery thereof.

Defendant's answer admitted issuance and delivery of the policy, payment of premiums in advance to September 15, 1927, and conversion of the policy into nonparticipating term insurance for the extended period from September 15, 1927, to January 10, 1934; denied due proof of death and averred lack of knowledge as to the alleged disappearance of the insured on December 11, 1926; denied diligent inquiry in relation thereto by plaintiff and friends or other persons for them, or that McNaghten was actually or presumptively dead; averred that certain persons had seen McNaghten since his disappearance and denied plaintiffs' right of recovery on the policy. Plaintiffs' verified reply traversed the new matter set up in defendant's answer.

The policy sued upon contained the usual provision that "Except for non-payment of premium this policy shall be incontestable after one year from its date of issue if the Insured be then living; otherwise after two years from its date of issue."

At the beginning of the trial, it was stipulated into the record by the parties that "The whole question to be considered by the jury in this case is whether or

not Ralph W. McNaghten, the insured, was presumptively dead on or before January 10, 1934.''

The assured and beneficiary were lawfully married on September 1, 1901, and had reared a family of two boys, both now surviving. Assured first worked as a farm hand for one year and then engaged in tenant farming on his own behalf until 1922. He then quit farming and moved into Farmer City, having previously served two terms as a township highway commissioner. Before leaving the farm in 1922, he became an agent for the sale of road machinery for the firm of Lockett & Spencer, of Peoria, representing them in territory comprising several Illinois counties. He continued in that occupation after leaving the farm until his final disappearance from Farmer City on December 11, 1926.

The testimony of Launa McNaghten, her sons and other of plaintiffs' witnesses tended to show that the assured was not a drinking man, was not cross, but had a good disposition, did not quarrel with his wife and that they had no serious disagreements; that he helped her with the household and laundry work while on the farm; that on Friday before the Saturday morning on which he left home, he went to Champaign on business and was accompanied by his wife, who did shopping there with money which he gave her, and that evening they attended a picture show together upon their return to Farmer City; that he was affectionate to his family, gave sons a pony and automobiles and spending money and always had supported his family; that he spent the nights at home when possible, attended basket ball games and athletic events with his sons and apparently lead a normal and congenial family life; that on Saturday morning of December 11, 1926, he left on the morning train on an alleged business trip to Iroquois county in pursuit of his employment, stating that he expected to return home by train that evening; that he was driven to the

train by his youngest son, Leslie, aged 17, in a car which had been given to the latter by his father in which to attend high school; that there had been no quarrel between the parents nor with either of the sons and the father bade his wife an affectionate good-bye on that morning as usual; that their oldest son, Lyle, aged 24 years, was married, had a small son of whom assured was very fond and that Lyle was employed as caretaker of the Le Roy Country Club; that assured was born in 1880, health "alright," had "bad eyes," wore glasses, worked "right along"; that assured had three sisters and a father living in Indiana; that when he left home, he owed two principal notes for $2,800 and interest thereon to the First National Bank of Le Roy, but that the bank was not pressing him for payment of his obligations at that time; that he owed certain accounts for garage, labor and repairs and for clothing and other necessaries aggregating $307.63; that aside from his commissions on sales, which were alleged to be substantial, his personal property consisted of household goods, two automobiles, a cow and a calf, a small balance in a checking account in the bank against which his wife had been permitted to check, together with some earned commissions due from his employer which were later paid to the wife; that he left three life insurance policies then in force, being one for $3,000 in defendant company in addition to the policy sued on and a $2,500 policy in the Bankers Life, in all of which his wife was named as beneficiary. Testimony was also given by the beneficiary, her two sons, Stuart Kelley, and certain other witnesses for plaintiffs, concerning various inquiries made to post offices, associates, bank, insurance agents, employers, relatives and other persons in efforts to locate or learn what had become of the assured after his disappearance, all of which were unsuccessful. We need not set forth in detail the evidence of various efforts made to locate the assured or ascer-

tain what became of him. Much evidence was heard thereon. It appears that neither the plaintiffs nor the defendant were ever able to learn what became of the assured after his disappearance.

Defendant company offered certain testimony by witness Roy Bryan to the effect that in the fall of 1927 or 1928, he had seen and spoken to the assured at a machinery exhibit tent at the Peoria exposition. Cross-examination developed that it was uncertain whether the time was before or after the date of disappearance, and the witness stated that he did not remember whether or not he had previously testified that "it could have been in 1926." In rebuttal, Charles Spencer, of the firm of Lockett & Spencer of Peoria, by whom the assured had been employed as a salesman since 1922 and who had been in attendance at the firm's annual fair exhibit in 1926 and previous years, testified that the firm had an exhibit at the exposition both in 1927 and 1928 at which Spencer spent many hours of his time and that he did not see McNaghten either at the exhibit tent or on the fair grounds either year. The alleged incident does not appear to have been reported to Mrs. McNaghten or the children.

Wilbur Forbes testified that he thought he saw assured driving a Ford car on two occasions while passing in opposite directions along a highway between Le Roy and Farmer City when the respective cars were traveling about 30 or "35 or 40 miles" an hour, "but was never positive" whether it was after the date of his disappearance. This witness also admitted that he had testified at a previous trial that he "did not believe that I ever really was sure that it was Ralph," that it looked like Ralph, but for me to say that I think it was Ralph, I would not be sure; that there were four men in the car when witness passed them and he only had a glance and had testified at the former trial that he "did not have time enough to look at him and be positive."

Witness Arthur Giles testified to his introduction by the assured to a woman at the exhibit tent at the Peoria fair which he stated to be either in the year 1923, 1924, 1925 or 1926, but that he could not say which, and that assured had several rooms at the Metzger Hotel for use of prospective customers and friends; that witness and others slept in the rooms; that the witness took the woman to dinner and to a theatre in the evening and left her at the hotel that night and on the following morning, after speaking to assured, took the woman, whose name he could not give, to a depot of one of the railroads, but which of the railroads he could not recall, bought her a ticket to a destination which he could not remember, paid for her ticket and later got the money back from the assured; that he was shown a letter from the woman by assured in the summer or fall before the latter left home in which she had invited assured to come to Milwaukee, and assured suggested that he and witness go there, but they did not go. Objections to oral proof of the contents of this letter and its materiality were made and sustained. It is conjectured that the assured may have later met this woman. Whether that is a reasonable inference from the evidence or whether the vague and uncertain statements of this witness were credible, reasonable or worthy of belief, when considered with all other facts and circumstances in evidence, was a matter for the jury to determine. Launa McNaghten testified that she attended the fair in 1923, was with her husband and he returned home at night with her.

The postal card referred to was received on the morning of December 13, 1926, by the son Leslie and had been mailed from Chicago on December 11th at 12:00 p. m. addressed to the son, which read "Am in Chicago. Don't know when I will be home. Don't worry. Dad." That appears to have been the last that was ever heard from him by any member of his family or by any other person so far as the testimony

shows. Much favorable testimony was given concerning the father's treatment and filial attitude toward his family; his work as a successful and satisfactory salesman of road machinery; the fact that the wife knew that he had once gone away to Rockford for a brief period in 1905 when confronted by financial difficulties; that the defendant company had corresponded with plaintiff's counsel after letters of administration were taken out by the wife in 1939 following proof of presumptive death in the probate court; that in the course of the company's correspondence and inquiries, they gave addresses of men of similar names to that of the assured who had taken out automobile licenses in Dakota and Indiana, which proved upon inquiry, not to have been the assured but to be other persons; that the company finally disclaimed liability under the policy and the suit then followed. In view of the conflicting and voluminous testimony offered as to whether assured was or was not seen; the lapse of time, vague memories, uncertain and inherently contradictory nature of the testimony of those who claimed to have seen or spoken to him either before or shortly after his disappearance, which recitals materially varied from their testimony at a previous trial; the nature and extent of numerous inquiries made by the assured's beneficiary, family and friends in seeking to locate the assured and the measure of diligence exercised in so doing, became controverted questions of fact under the evidence herein. The credibility of the witnesses and the preponderant weight and probative value of the testimony were peculiarly matters for the consideration of the jury which saw and heard the witnesses testify. Certainly, the period of fifteen years which had elapsed after assured's disappearance and before the date of the trial, coupled with the vague, conflicting and partially impeached statements of witnesses, whose testimony was offered by the defendant to rebut and overcome any presumption of

death prevailing at the end of seven years and before the expiration of the extended insurance period on January 10, 1934, rendered the credibility and probative value of all such evidence, when considered with plaintiffs' testimony in relation thereto and of all that transpired before and after such disappearance, questions of fact which were found and considered by the jury and by the trial court adversely to the contentions of the defendant.

The applicable and controlling rule of law concerning the presumption of death after seven years of unexplained absence of the assured from his home and usual place of abode, followed by diligent efforts to ascertain his whereabouts, is fully considered in a case wherein the facts were in many respects similar to those in the case at bar and wherein a judgment of the trial court was affirmed by this court and by the Supreme Court, as set forth in *Kennedy v. Modern Woodmen of America,* 149 Ill. App. 471; 243 Ill. 560, 566, 90 N. E. 1084, in the following language: ''The law is well settled in this State that where a person leaves home with the expectation of returning thereto within a short time and he remains away and his absence is unexplained and unaccounted for and no intelligence is received from him and he is not heard from, and his whereabouts cannot be ascertained although diligent search and inquiry are made in the vicinity of of his home and at such places as he would be likely to go and from such persons as he would be likely to meet and know and nothing is heard from or of him, and he remains away from his family and home for the period of seven years, a presumption arises from these facts that he is dead, unless there are other facts and circumstances shown which will rebut and overcome such presumption of death.'' Proof of such inquiry made both before and after the expiration of seven years of absence may be made, and proof of further inquiry made thereafter is not improper. *Kennedy v. Modern*

*Woodmen, supra.* The rule of law is well established that the continuous absence of a person from his home or place of residence for seven years, during which period nothing is heard from or concerning him, raises the presumption of his death for all legal purposes. *Tegtmeyer v. Tegtmeyer,* 348 Ill. 434, 439, 181 N. E. 297; *Eddy v. Eddy,* 302 Ill. 446, 134 N. E. 801; *Reedy v. Millizen,* 155 Ill. 636, 40 N. E. 1028.

An examination of the Illinois cases indicates that the prerequisites which justify a presumption of death after seven years of continuous absence are: (1) that the person whose death is in question has disappeared from his last known abode, domicile or place of residence; (2) that he has neither returned thereto nor communicated with those with whom he would naturally communicate, if alive, during the ensuing period of seven years; (3) that diligent inquiry has been made at his last known place of abode of the persons who would naturally hear from him without obtaining information indicating that he is alive. Out of such proof, a presumption of death arises for all legal purposes, which presumption is rebuttable and may be disproved by competent evidence that the party so presumed to be dead is in fact alive. *Carey v. Metropolitan Life Ins. Co.,* 305 Ill. App. 308, 27 N. E. (2d) 634; *Piersol v. Massachusetts Mut. Life Ins. Co.,* 260 Ill. App. 578; *Eddy v. Eddy, supra.*

We hold that defendant's assigned error that the verdict is contrary to the manifest weight of the evidence is not sustained by the record. Concerning defendant's motion for a directed verdict in its favor, we hold the applicable rule of law to be that when it appears that plaintiff has introduced material and relevant evidence which, with all reasonable inferences arising therefrom, when viewed in the light most favorable to the plaintiff, fairly tends to prove the material allegations of the complaint setting forth plaintiffs' cause of action, the motion for a directed

verdict should be denied. We find and hold from the evidence that the trial court properly denied defendant's motion for a directed verdict herein.

Error is assigned in the admission of testimony concerning a certain alleged self-serving statement of assured by witness McKinley to the effect that the assured was giving up the farm because there was too much work for Mrs. McNaghten, that there was no tenant house and help was too hard to keep. This was merely cumulative of testimony of Mrs. McNaghten given without objection thereto on a matter not controverted by other evidence, was of minor import and could not, in our opinion, have been in any way prejudicial to the defendant. An offer was made to show by witness Spencer that in 1923 at the Peoria fair, the time not being specified, but apparently prior to issuance of the policy on September 15th of that year— McNaghten made some remark about having some woman at the hotel, whose identity was not disclosed. This purported remark or alleged statement against interest was offered as corroborating Giles, who spoke of some woman being there in either 1923, '24, '25 or '26. It might have tended to reflect on the morals of the defendant who became insured that year under the policy containing an incontestible clause, but containing no provision concerning assured's moral conduct. Although the policy contained a clause reserving right to change beneficiary, and hence the latter had no vested interest in the policy, the offered evidence did not thereby become admissible as an exception to the hearsay rule as contended by defendant, since it was not an admission or declaration against McNaghten's pecuniary interest in the policy, and in no way concerned nor affected any of the terms or provisions of the policy contract nor any interest thereunder. We hold that it was not error to exclude the purported statements under the circumstances indicated. The same is true concerning proof of the purported con-

tents of a letter which Giles said he read in the summer or fall of 1926 and for the introduction of which no proper foundation had been laid. In the trial court's rulings on the admission or refusal to admit testimony, we find no prejudicial error.

Further error is assigned in the giving and refusal of certain instructions, which we have carefully examined and considered, but such instructions, when considered as a series, fairly instruct the jury as to the law applicable to the evidence herein and contain no prejudicial nor reversible error. All of the proof fixed the date of the insured's disappearance from his home and place of abode as December 11, 1926, and the verdict of the jury negatives defendant's contention that the insured was seen thereafter. The time when the extended term of insurance expired was stipulated by the parties and so read to the jury, as being January 10, 1934. Plaintiffs' given instruction number 5 and defendant's instructions numbers 14, 15, 16, 17, 20 and 21 all set forth the necessity of seven years unexplained absence to establish the presumption of death. Defendant's instructions numbers 16 and 17 expressly required proof of such unexplained absence and that the jury believe from the evidence that the assured was not seen alive by any person for a period of more than seven years prior to January 10, 1934 or in default thereof that a verdict be returned for the defendant. In addition thereto, the respective pleadings alleged said date and the court read to the jury the stipulation that ''The whole question to be considered by the jury is whether or not Ralph W. McNaghten, the insured, was presumptively dead on or before January 10, 1934.'' We deem the jury to have been fully and fairly instructed and advised in writing by the court as to the law governing the issues joined in the pleadings and stipulations by the parties herein.

Concerning alleged prejudicial statements in argument of counsel, which were either based upon the evi-

dence, made in answer to statements of defendant's counsel or to which objections were sustained and the jury instructed to disregard the same, we likewise find no prejudicial nor reversible error. Defendant's motion to set aside the verdict and grant a new trial was properly denied.

Believing that the case was fairly tried; that the record is free from reversible error and that substantial justice was done between the parties, the judgment of the circuit court is affirmed.

*Judgment affirmed.*